**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEW HAMPSHIRE**

United States of America

v.

Crystal Hardy

1:19-cr-00250-PB-1

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF
HER MOTION TO SUPPRESS EVIDENCE**

I.    Introduction

    Ms. Hardy is charged with one count of Conspiracy to Distribute and Possess with Intent to Distribute a Controlled Substance contrary to 21 U.S.C. 841(a)(1) and 846. Ms. Hardy seeks to suppress certain tangible evidence obtained by members of the Tilton Police Department on April 5th and 6th of 2019 based on a warrantless search of her truck and the closed bags within. Suppression is appropriate because the initial search of her truck was not a legally permissible inventory search. Specifically, the Tilton Police Department Inventory Policy has no standardized criteria with respect to opening containers found in a vehicle during an inventory search. Consequently, the search was in violation of the 4th Amendment to the United States Constitution and the evidence must be suppressed.

    Additionally, the statements Ms. Hardy made on scene and at the police station after her arrest, and the evidence obtained pursuant to the search warrant predicated on the illegal search and statements must be suppressed as fruit of the initial illegal search.

II.    Facts

    On April 5, 2019, Sergeant Bryan Kydd-Keeler was in a cruiser parked in the parking lot of Winnisquam Dental in Tilton, New Hampshire. (Exhibit A, *Narrative for Bryan Kydd-Keeler*). He observed a white Ford F150 pass by him. He noted that it had a cracked

windshield and was not displaying a valid inspection sticker. *Id*. He pulled out of the parking lot and began to follow the truck. During his pursuit of the truck, he ran the license plate in his mobile data terminal and learned that the registered owner was the Defendant, and that her license was suspended. *Id*.

Eventually, he pulled the truck over in front of the "Tilton Shop Express" on Laconia Road in Tilton. *Id*. As he approached the truck, he could see that the driver was the Defendant as he was "personally familiar with her." *Id*. He also recognized the passenger, Christopher Kelly, and "knew him to be a violent felon and confrontational with the police." Sergeant Kydd-Keeler explained to Ms. Hardy why he pulled her over and that her license was suspended. She expressed surprise that her license was suspended, and he agreed to confirm with dispatch that the information on his MDT was correct. *Id*. As he was waiting for the information to come back, he asked the Ms. Hardy and Mr. Kelly whether there was any drug paraphernalia, drugs, pipes or "rigs" in the car.[1]

While the Defendant and Sergeant Kydd-Keeler were waiting for confirmation of the license suspension, Detective Sergeant Nate Buffington arrived. Detective Buffington had been listening to the police communications and heard that Sergeant Kydd-Keeler had stopped both Hardy and Kelly. (Exhibit B, *Narrative for Nate Buffington*). Earlier that day, he had received a phone call from Lt. Macintosh of the Sanbornton Police Department, informing him that a vehicle registered to Ms. Hardy was staying at the Steele Hill Resort in that town. *Id*. Lt. Macintosh asked Detective Buffington if he was familiar with Ms. Hardy. Detective Buffington noted in his narrative that he knew that Ms. Hardy was involved with illegal drugs.[2] Additionally, a little more than two weeks prior to this motor vehicle stop,

---

[1] Sergeant Kydd-Keeler was equipped with a body camera which was activated during this encounter. These questions are not documented in his narrative but can be heard on the bodycam video.
[2] It is unclear from Detective Buffington's report whether Lt. Macintosh relayed any information to him about drug activity on behalf of Ms. Hardy.

2

Detective Buffington had learned from a confidential source that Christopher Kelly "was selling large quantities of methamphetamine" and that he was "dating a new girl." *Id.*

When Detective Buffington arrived at the scene, he went to the passenger side of the truck and engaged with Mr. Kelly. In Detective Buffington's opinion, Mr. Kelly "appeared very nervous." *Id.* At this time, Sergeant Kydd-Keeler was taking Ms. Hardy into custody for operating after suspension. After ascertaining he had no outstanding warrants, Detective Buffington told Mr. Kelly he was free to leave. Detective Buffington allowed Mr. Kelly to retrieve his drink from the truck before he left. Detective Buffington states in his report that "[he] got the feeling" that Mr. Kelly "wanted to take one of the bags that was also in the vehicle, but was hesitant." *Id*.

After he asked her to get out of the truck, Sergeant Kydd-Keeler led Ms. Hardy back to his cruiser. Along the way, he asked her what she had in her pockets. She stated that she had a "hot rail" which is a street term for a methamphetamine pipe. *Id.* Although it is not included in his report, it is documented on the bodycam footage that Sergeant Kydd-Keeler then asked Ms. Hardy, "Is he (Mr. Kelly) going to have any dope in the car? Any drugs? Anything like that?" When Ms. Hardy said there were none, Sergeant Kydd-Keeler responded "Are you positive? Because I've been hearing a lot of rumors about Chris moving some stuff around and I want to make sure there is no dope inside the car."

This line of questioning continued as Sergeant Kydd-Keeler searched the person of Ms. Hardy. Specifically, he asked whether there would be any more drug paraphernalia in the car, whether there would be any "rigs" and asked her to confirm there would be "no hides or anything crazy" in the car.[3] Sergeant Kydd-Keeler then placed Ms. Hardy in his cruiser and retrieved a form for conducting an inventory search.

---

[3] Again, this is not documented in any report, but can be heard on the bodycam video.

3

As Sergeant Kydd-Keeler started going back to the truck, Detective Buffington asked him whether Ms. Hardy said about any drugs in the car. Sergeant Kydd-Keeler replied that "she said there's nothing, that's what she said, so." He then relayed Ms. Hardy's responses to his questions about the contents of the truck. Before the two officers begin the inventory search, Detective Buffington discussed with Ms. Hardy whether there were any valuables in the car that she wanted protected. Although it is difficult to discern, it appears that Ms. Hardy asks that her laptop computer be brought inside.

Sergeant Kydd-Keeler and Detective Buffington conducted the search pursuant to the Tilton Police Department Inventory Policy. (Exhibit C, *Tilton Police Department Inventory Search Policy*). With respect to closed containers found during a vehicle inventory search, the policy states at ¶ III (7), "[a]n inventory of a vehicle may include all areas of the passenger compartment, glove compartment, truck and any open or closed containers therein. Locked containers for which keys are available may be opened in order to achieve the purposes of the inventory." *Id*. (emphasis added). The policy is devoid of any meaningful guidance or criteria for an officer to apply in deciding whether to open a container during the search.

Sergeant Kydd-Keeler conducted the search, and Detective Buffington acted as his scribe. (Ex. A and B). The first item Sergeant Kydd-Keeler focused on was a flashlight stored in the driver's side door pocket. He opened the flashlight, removed the batteries, and struck the base in an apparent effort to shake loose anything inside the flashlight housing.[4] Next, he found a ring in a coat pocket. (Ex. B). Underneath the coat was a "Harley Davidson" bag. Sergeant Kydd-Keeler opened the bag. Inside that bag was a makeup bag. He opened the makeup bag and found a chunk of tan powder and a bag of crystal substance.

---

[4] This is apparent from the bodycam footage.

*Id*.  Based on his training and experience he determined that these items were illegal drugs. He then stopped the search, with a plan to seize the vehicle and apply for a search warrant. *Id*.

When he went back to Ms. Hardy, Sergeant Kydd-Keeler read Ms. Hardy her *Miranda* rights.  He then informed her of his discoveries. He states that Ms. Hardy argued with him and told him that he did not have the right to open a bag inside the vehicle.  *Id*.

After he transported her to the police station, Sergeant Kydd-Keeler obtained inculpatory statements from Ms. Hardy.  Specifically, he wrote that she stated the drugs in the truck were hers.  Sergeant Kydd-Keeler used the information gained from the search, as well as Ms. Hardy's statements, in his application for a search warrant.  (Exhibit D, *Warrant Affidavit, Warrant and Return*).  When he executed the warrant, he seized more drugs and other items which form the basis of the charge against Ms. Hardy.  (Exhibits D and E).

III.   <u>Legal Argument</u>

Warrantless searches are *per se* unreasonable under the Fourth Amendment unless one of a few recognized exceptions applies. *Riley v. California,* 573 U.S. 373, 382 (2014) (citation omitted).  An inventory search of a motor vehicle constitutes an exception to the Fourth Amendment warrant requirement. *Colorado v. Bertine*, 479 U.S. 367, 371 (1987); *South Dakota v. Opperman*, 428 U.S. 364, 372 (1976).  Inventory searches, carried out routinely in accordance with a standardized policy setting out reasonable criteria, are reasonable searches under the Fourth Amendment, notwithstanding the absence of a warrant. *Boudreau v. Lussier*, 901 F.3d 65, 73 (1st Cir. 2018)  An inventory search is subject to reasonableness requirements, however.  For an impoundment and inventory search to be reasonable under the Fourth Amendment the police must be acting in good faith, and not using the

impoundment and inventory as a pretext to conceal an investigatory motive. *See*, *Opperman*, 428 U.S. at 376; *See also*, *Bertine*, 479 U.S. at 372; *Florida v. Wells*, 495 U.S. 1, 4 (1990).

The issue in this case is Sergeant Kydd-Keeler's search of closed containers in the truck during the search and the lack of guidance in the inventory policy with respect to when, and when not, to open those containers. The United States Supreme Court addressed this very issue in *Florida v. Wells*, 495 U.S. 1 (1990). In that case, the Florida Highway Patrol impounded the defendant's car. During the inventory search, the police found a suitcase in the trunk. The suitcase was opened, and marijuana was found. *Wells*, 495 U.S. at 1. The Highway Patrol had no policy regarding the opening of closed containers in an inventory search.

In light of the complete lack of any Highway Patrol policy with respect to opening closed containers in an inventory search, the *Wells* court affirmed the suppression of the marijuana evidence. *Id*., 495 U.S. at 4-5. The Court cautioned that the "individual police officer must not be allowed so much latitude that inventory searches are turned into 'a purposeful and general means of discovering evidence of crime.'" *Id*., 495 U.S. at 4. (quoting *Bertine*, *supra*, at 376). The Court concluded that either a policy of opening all closed containers or one of opening no closed containers would be permissible. It stated further that "it would be equally permissible, for example, to allow the opening of closed containers whose contents the officers determine they are unable to ascertain from examining the containers' exteriors." *Id*. In order to avoid the danger that the inventory search could be used as a "ruse for a general rummaging" the Court held that any discretion accorded officers must be governed by "standardized criteria." *Id*.

Here, the Tilton Police Department Inventory Policy gives no guidance to the officers with respect to closed containers. As stated above, the policy instructs the officers that they

"may" open closed containers.  *See* Ex. C, ¶ III (7).  This open-ended directive stands in contrast to other portions of the same policy.  For example, in ¶ III (10)(a), with respect to booking inventory of a person, the policy states that it "<u>shall</u> include a search of the person, their garments, wallet, handbag or purse, <u>and any open or closed containers which they are carrying</u>."  *Id*.  (emphasis added).  Similarly, with respect to a booking inventory of an intoxicated or mentally ill person, the policy limits the search of open and closed containers to those "large enough to carry a dangerous device" and a wallet or purse may only be searched if "necessary to establish their identity."  *Id*. at ¶ III (10)(b).

Thus, the authors of the policy had the ability to establish criteria and to give guidance to the officers conducting the search if they so chose.  Courts have upheld inventory search criteria that allows for some discretion.  *See e.g., Marling v. Littlejohn*, 964 F.3d 667, 670 (7th Cir. 2020) (Inventory policy upheld where it combines a presumptive rule of opening everything with a discretionary "should avoid" exception when the damage would be "unreasonable" in the officer's judgment).  It is the lack of any criteria in the Tilton policy that is unconstitutional.

Sergeant Kydd-Keeler and Detective Buffington had a clear intent to search for evidence of a crime in Ms. Hardy's truck.  This is evident from the initial questions that Sergeant Kydd-Keeler poses at the outset with Ms. Hardy by the driver's side door.  As they are waiting to confirm that her license is suspended, he asks about drug paraphernalia, "rigs," pipes and drugs in the car.  When faced with denials, he persists as he is conducting a search of her person incident to the arrest.  At this point he is insistent with her about drugs in the car.  He states unequivocally that he has concerns about Mr. Kelly strong drugs in the car ("Are you positive? Because I've been hearing a lot of rumors about Chris moving some stuff around and I want to make sure there is no dope inside the car.").  Later, when Sergeant

7

Kydd-Keeler and Detective Buffington interact, the first question Detective Buffington poses to Sergeant Kydd-Keeler is about whether Ms. Hardy said there were any drugs in the car. Additionally, Detective Buffington documented his suspicion that both Mr. Kelly and Ms. Hardy were involved with illegal drugs even before he arrived at the traffic stop. (Exhibit B).

The purpose of the search was patently evident from the outset. The first item searched was a flashlight that was stored in the driver's side door. It was taken apart and searched for drugs. There was no "inventory" purpose to undertake such a detailed search. The subjective intent of the officers is important, because an "uncanalized discretion to police officers conducting inventory searches" is forbidden. *Wells*, 495 U.S. at 4. Had the policy been more detailed, and provided guidelines, the officers' intent would be of no import. *See United States v. Hawkins*, 279 F.3d 83, 86 (1st Cir. 2002) (rejecting the challenge to a search where the defendant alleged the inventory was a "ruse" to search for drugs because "[t]he subjective intent of the officers is not relevant so long as they conduct a search according to a standardized inventory policy").

In addition, both Ms. Hardy's post-arrest statement to the police and all items obtained from the warranted search of the truck must also be suppressed as "fruit of the poisonous tree." *See U.S. v. Camacho,* 661 F.3d 718 (1st Cir. 2011). Evidence obtained during a search may be tainted by the illegality of an earlier Fourth Amendment violation, so as to render such evidence inadmissible as "fruit of the poisonous tree." *Id.* (quoting *U.S. v. D'Andrea,* 648 F.3d 1, 6 (1st Cir.2011). "[T]he exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality…" *Segura v. U.S.,* 468 U.S. 769, 804 (1984) (internal citation and quotation omitted). In determining whether suppression is warranted, "the more apt question … is whether, granting establishment of the primary illegality, the

evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. U.S.,* 371 U.S. 471, 487 (1963).

Here, both Ms. Hardy's post-arrest statement to the police (*see* Ex. A) and all items obatined via the search warrant for her truck "flowed directly from the original unlawful [search]" of Ms. Hardy's truck and the resultant discovery of illegal drugs. *Camacho,* 661 F.3d at 730. Further, neither the statement nor the items were "so attenuated as to dissipate the taint" of the unlawful search of Ms. Hardy's truck. *Id.* (citing *Nardone v. U.S.,* 308 U.S. 338, 341 (1939)). The discovery of the drugs in the truck, and her statements about the drugs thereafter, served as the primary basis for the search warrant executed on her car.  (*See* Exhibit D, *Warrant Affidavit, Warrant and Return*). Further, it was only after the unlawful search and resultant discovery of the drugs that Ms. Hardy made numerous statements to the police regarding the contents of the truck. *See* Ex. A. These statements to the police were the direct result of the discovery of the drugs in the truck.  Because the underlying Fourth Amendment violation produced the evidence giving rise to both the statements and the warrant, the latter are not sufficiently attenuated to purge any related taint.  *See Brown v. Illinois,* 422 U.S. 590, 603-604 (1975) (finding that "temporal proximity [ ], the present of intervening circumstances, and, particularly the purpose and flagrancy of the official misconduct are all relevant" to determining attenuation.) As such, both the post-arrest statements to the police, and the items obtained from the search warrant execution should be excluded as fruit of the poisonous tree.

IV.     Conclusion

For these reasons, Ms. Hardy respectfully requests that this Honorable Court grant her motion to suppress the tangible evidence uncovered as a result of the unreasonable search of

her vehicle, as well as the post-arrest statements made to the police and the further evidence obtained as a result of the search warrant execution.

Respectfully submitted,

 */s/ John P. Newman*
John P. Newman, Esq.
NHBA No.:  8820
Newman Law Office, PLLC
15 High Street
Manchester, NH 03101
(603) 935-5603
john@newmanlawnh.com

CERTIFICATE OF SERVICE

    I hereby certify that a copy of the foregoing Motion has been forwarded by electronic mail through the ECF system on January 12, 2021 to Debra M. Walsh, Esq., and to Patrick Richard, Esq., counsel for the codefendant, Christopher Kelly.

 */s/ John P. Newman*
John P. Newman
